No. 2679.

## E. G. Moody *v*. The State.

Murder—Evidence—Fact Case.—See the statement of the case for evidence objected to by a defendant on trial for murder, *held*, in view of the other proof in the case, to have been properly admitted; and note that the evidence as a whole is held amply sufficient to support a conviction for murder in the second degree.

Appeal from the District Court of Falls, on change of venue from the District Court of Limestone. Tried below before the Hon. Eugene Williams.

The indictment in this case charged the appellant and Mitch Sanders, as principals, with the murder of Sam Scott, in Limestone county, Texas, on the thirteenth day of March, 1885, and likewise impleaded John P. Bagwell and Joe Bowers as accomplices to the same murder. The venue as to the appellant and Sanders was, upon their motion, changed to Falls county, in the district court of which county the appellant, being alone upon trial, was found guilty of murder in the second degree, his punishment being assessed at a term of five years in the penitentiary.

J. W. Towers was the first witness for the State. He testified that in March, 1885, he lived in the town of Thornton, in Limestone county, Texas, at which time he followed the occu-

pation of a retail hardware dealer. About nine o'clock on the morning of March 13, 1885, two parties, then strangers to him, but who he afterward saw and recognized in the Groesbeck jail as John P. Bagwell and Mitch Sanders, came into the witness's store in Thornton, and Sanders purchased from him a box of thirty-eight calibre center fire pistol cartridges. The box which contained said cartridges was made of paper, and the witness's private cost mark was endorsed on the same. The witness could not now remember that cost mark. Two or three days after the said sale to Sanders, the witness saw the said box, or one exactly like it, bearing his private cost mark, in the grand jury room in Groesbeck, Texas. A small part of the box was then gone, and appeared to have been torn off. The witness observed the said parties when they left Thornton. They went south over the Kosse road toward Kosse. They had three horses with them, and were riding two and leading one of them. The witness did not remember the description of the said horses. They also had a new black leather saddle, which they purchased that day from Mr. J. C. Spencer. The witness had no regular customers residing beyond Kosse on the Kosse and Franklin road, and had no recollection of ever selling cartridges to any other person who lived beyond Kosse.

Cross examined, the witness said that he had transient customers at that time, and had frequently sold such cartridges as he sold to Sanders in similar boxes, bearing the same cost mark. While witness could not swear positively that the cartridge box he saw in the grand jury room was the box he sold Sanders, it was, in every respect, the same kind of a box.

J. C. Spencer testified, for the State, that he kept a harness and saddle shop in Thornton, in March, 1885. On the thirteenth day of that month, in the forenoon, he sold a stationary covered red leather saddle to two young men whom he did not know at the time. A day or two after the murder of Sam Scott and Savannah Brown the witness saw and identified the said two young men in the Groesbeck jail, and then learned their names to be John P. Bagwell and Mitch Sanders. Bagwell and Sanders had three horses with them in Thornton—riding two and leading one. When they left they went south toward Kosse, which was eight miles distant from Thornton.

George Herrod testified, for the State, that he kept a retail liquor saloon in Thornton on the thirteenth day of March, 1885, and on the morning of that day had a call from two young

men for a quart of whisky. He put the whisky in two pale green whisky bottles or flasks. He remembered the flasks distinctly, because he had to open a fresh box to get them, and when he took them out he saw for the first time that he had whisky flasks of that description. The sale of the whisky to the said parties was particularly impressed upon the mind of the witness by the fact that the older of the two handed the witness a twenty dollar greenback bill from which to take his pay. Being unable to change the bill, he took it to every merchant in town, but could get no smaller change than two ten dollar bills. He then returned to his saloon and reported to the young men that he could not get the bill changed. The young man then turned to his companion and borrowed a dollar from him, with which he paid the witness for the whisky. Witness afterward identified those two young men in the Groesbeck jail, and learned that their names were John P. Bagwell and Mitch Sanders. Bagwell was the man who bought the whisky and offered the twenty dollar bill in payment, and Sanders was the man who loaned him the dollar with which he finally paid for the whisky. Witness did not see the horses ridden or led by Bagwell and Sanders, nor did he see those parties when they left Thornton. The witness was afterward before the grand jury in Groesbeck. He had a faint recollection of seeing a pale green whisky flask in the grand jury room, but was not certain that he did. The witness had no regular customers who lived below Kosse on the Kosse and Franklin road.

Cross examined, the witness said that he sold a great deal of whisky in flasks to transient customers—cow boys and others, —in March, 1885. While he could not now recall any other particular transaction, he thought he could safely say that he sold to other parties than Bagwell and Sanders, on the same day, whisky put up in flasks of the same kind, taken from the same case. Witness bought the said flasks from Ullman, Lewis & Co., of Galveston. There were other retail liquor dealers in Thornton who, as witness supposed, bought flasks from Ullman, Lewis & Co., and it was quite probable some of them had similar pale green flasks in stock on the said March 13, 1885, and it was quite possible that some of those retail dealers had customers living beyond Kosse on the Franklin road. :

John Grissum testified, for the State, that he was in Herrod's saloon throughout the transaction detailed by Herrod, and corroborated Herrod's statement in every particular.

Cab. Hood testified, for the State, that he lived in the town of Kosse in March, 1885, and was then engaged in the livery stable business. On the thirteenth day of that month he was hired by a drummer to take him to Thornton in a buggy. At about eleven o'clock a. m., the witness and the drummer met two men, each riding a bay horse, and one of them leading a bay horse somewhat larger than either of the other two. It was the recollection of the witness that the led horse had a saddle on, but the witness was now unable to say whether it was a new or an old saddle. Each of those men was dressed as cow boys, wearing broad brimmed stockmen hats. Each had a slicker tied behind his saddle, and one of them wore a ducking round-about jacket. The witness afterwards saw John P. Bagwell and Mitch Sanders in the Groesbeck jail, and recognized them as the men he met on the road between Kosse and Thornton, on the said thirteenth day of March, 1885.

Alex Graves testified, for the State, that he was a blacksmith by trade, and, in March, 1885, lived in Kosse, where he kept a shop. His said shop was situated on the east side of the railroad, about one hundred yards east of Autry's barber shop. About noon on the thirteenth day of March, 1885, just as the witness was closing his shop to go to dinner, two young men, then strangers to witness, but whom he has since known as John P. Bagwell and Mitch Sanders, came to his shop, each riding a bay horse, and one of them leading a somewhat larger bay horse that had a white spot on the belly, about the girth. One of them inquired if witness was closing up. Witness replied that he was, and asked if they wanted any work done. They replied that they wanted their horses shod, but would wait until witness got back from dinner. They then dismounted, and hitched their horses at the shop, and witness went to his dinner. Witness returned to his shop about one or half-past one o'clock, and, after working an hour or more, the parties not having returned, went up town to hunt for them. At Autry's barber shop he found the two strangers in company with the defendant and Joe Bowers, both of whom he knew. Autry had just finished shaving the defendant when witness reached the shop. Witness asked the strangers if they wanted their horses shod. The younger man of the two,—Sanders,—stepped to the door, looked at the sun and replied that it was then too late, as they had to reach the neighborhood of Franklin by night, but that they would return on Tuesday, when they would get witness to

shoe their horses.    About that time the defendant asked the
strangers if they were ready to go.    They replied that they
were, and defendant and Bowers said that they would go down
town, get their horses and meet the said parties at witness's
shop.    Witness went back to his shop with Bagwell and San-
ders, who got on their horses.    They were soon joined by the de-
fendant and Bowers on horseback, and the four then left wit-
ness's shop, going towards Franklin over the Kosse and Frank-
lin road.    In traveling that road to Franklin the parties would
necessarily pass the houses of George Lewis, Pitts, Welch,
Wadsworth and Samuels.    None of the parties called each
other by name in the hearing of the witness, and witness did
not know whether Bagwell and Sanders were personally known
to defendant and Bowers.    On the Sunday following the mur-
der of Sam Scott and Savannah Brown, the witness saw the
white bellied bay horse in constable Early's lot.    The said four
parties left Kosse about three o'clock in the evening, traveling
in a fast walk or fox trot,—a gait that would take them four
and a half or five miles an hour.

Henry Autry testified, for the State, that he kept a barber
shop in Kosse in March, 1885.    The witness closed his shop
about twelve o'clock, noon, on the thirteenth day of that month
and went home to dinner.    Returning about one or half past
one o'clock, he found two strangers sitting on a bench in front
of the shop, waiting for him.    Witness opened his shop, cut
the hair, shaved, shampooed and dyed the mustache of the
elder of the two men, whom he afterwards identified in the
Groesbeck jail as the man called John P. Bagwell.    He shaved
the other man, whom he afterwards saw in the Groesbeck jail
under the name of Mitch Sanders.    While Sanders was being
shaved, the defendant and Joe Bowers came into the shop and
met the other two men, Bagwell and Sanders, like old and
intimate acquaintances.    They shook hands "all round" and
entered into familiar and friendly conversation with each other.
After shaving Sanders, the witness shaved defendant, and
the four parties then agreed to leave town together.    Either
defendant or Bowers asked Bagwell and Sanders where their
horses were.    They answered that their horses were tied at the
blacksmith shop across the railroad.    Defendant and Bowers
then said they would go down town, get their horses and join
Bagwell and Sanders at the blacksmith shop.    A few minutes
later the witness saw the two parties, whom he took to be de-

fendant and Bowers, ride across the railroad towards Graves's blacksmith shop. The witness did not recollect that Alex Graves came to the barber shop while the several parties were there, and asked Bagwell and Sanders if they wanted their horses shod. The said four parties were dressed in ordinary citizens clothes. Witness did not remember what kind of hats they wore, and if either of them was armed the witness did not know it.

The testimony of the witnesses Towers, Spencer, Herrod, Autry and Graves, as above set out, is the testimony referred to in the head note as that objected to by the defendant on the trial. The objection urged to the testimony of the first three was that it related to the acts of Bagwell and Sanders before they are shown to have had any connection with the defendant, and that their testimony about the articles purchased by Bagwell and Sanders, and afterwards seen by the witnesses in the grand jury room, did not connect the defendants in any manner with the said articles. The objection urged to the testimony of Graves and Autry was that they should not have been permitted to express, inferentially or otherwise, any opinion as to whether or not defendant was acquainted with Bagwell and Sanders prior to meeting them in the barber shop.

Martha Brown testified, for the State, that she was the mother of Savannah Brown, and the mother-in-law of Sam Scott, the parties for the murder of whom the defendant was now on trial. The witness lived about two and a half miles east of the town of Kosse, and about a quarter of a mile north of Mrs. Martha Brooch's place. Witness's daughter Savannah lived with her until the day of her death. Sam Scott, at the time of his death, lived on Mr. Cole Roebuck's place. Mr. George Lewis and his wife lived about a mile and a quarter from Kosse on the Kosse and Franklin road. The witness spent the fatal day—March 13, 1885—at the house of the said Mr. Lewis, scouring. A few minutes after the clock struck three on that evening, Mrs. Lewis called the witness's attention to four men riding past the house on the Kosse and Franklin road, going towards Franklin. Mrs. Lewis then asked witness if she knew the men, to which inquiry the witness replied that she did not. The men were all riding separate horses, and one of them was leading an extra horse. The horses were all nearly of a color, being bays or sorrels. The witness paid no attention to the dress of any of the men. They were riding in a fast walk or

fox trot, and were laughing and talking as they passed the house.

The witness left her daughter Savannah at home on that morning. She was expecting Sam Scott to come to the house during that day, bringing witness's younger daughter, Mary, with him, the said Mary having been at Sam's house attending his wife who, about a week before, gave birth to a child. Savannah was to return with Sam and spend a week attending her sister. Sam and Savannah were to take with them a lot of baby clothing and a quilt, which said articles the witness, before leaving home on that morning, arranged in a tow sack. The quilt was placed at the bottom of the sack for the purpose of closing a torn place in it. The baby clothes were tied in a' sheet and placed in the sack, above the quilt. About one o'clock, p. m. witness's daughter Mary came to Mrs. Lewis's and asked witness if Savannah was to go home with Sam. Witness replied that she was, and directed Mary to return and tell Sam and Savannah to start at once. Witness got home about sunset and found that Savannah had left to go home with Sam Scott. About ten o'clock on the next morning a man came to witness's house and reported the discovery of the dead bodies of Sam Scott and Savannah, near the Persimmon pond, on the Kosse and Franklin road. Witness repaired at once to the point indicated. She found the body of Sam Scott lying on the right hand side of the road. There was a large bullet hole in his right side, and a smaller one in his head. The absence of blood about the wound in the head indicated that it was inflicted after death. From Scott's dead body Savannah was tracked in a circle, first south, then west, then north to a point, under a black jack tree, across the road, about one hundred yards distant from the said road, and about the same distance from Scott's body, where her dead body was found. There was a bullet hole through her head, entering about the center of her forehead. There was also a flesh wound on the right arm, which had bled profusely over her clothes on that side. The forehead about the wound was powder burned, and the wound contained many fragments or crumbs of tobacco. A roll of home cured leaf tobacco was grasped in one of the hands of the girl, and it was evident that she must have had her hand before her face when shot, and that the ball passed through the roll of tobacco before entering her forehead. The leaves and ground where her head was resting were covered

with blood and brains. The back part of the skull was shattered and reduced almost to jelly.

The track of the girl was followed from the dead body of Scott to the point where her body was found, and tobacco crumbs were scattered throughout the length of the trail between the bodies. The tracks showed the girl to have been running when shot down. The tracks of a horse followed the tracks of the girl throughout her flight. The tracks at one place showed the girl to have run into a tree top, in which tree top her bonnet was found. The horse tracks at that point showed the horse to have been suddenly checked. At another point on the trail the tracks showed the horse to have passed the girl, who evidently got behind a tree to avoid her pursuer; and the broken bark on that tree showed the horse to have run against it or to have struck it with his feet. At a point on the trail about fifteen steps from Scott's body a spot of blood was found which most probably had fallen from the girl's wounded arm, and from that point to the girl's body her flight over the trail was marked by blood spots as well as foot tracks. Witness had the bodies removed to her house, whence they were buried on that evening. Sam Scott's bench legged fice dog was lying by the side of Sam's body and protested savagely against interference with his dead owner. The bed quilt was partly in the sack on the road side, and the clothes which had been done up in a bundle were scattered along the road for some distance. Savannah's underclothing, when the body was found, was wadded and stuffed between her legs, and her dress was pulled smoothly down.

Cross examined, the witness stated that a large number of people were on the ground, and had hunted over it, when she reached the dead bodies. Savannah was about fourteen years old, and was having her menstrual flow for the third time when killed. Witness could not say that she discovered about the body of her daughter any indications of rape or attempted rape. Sam Scott was about thirty years old. The dead bodies were found on the Kosse and Franklin road, about two miles from the point where that road was intersected by the road which led to the witness's house via Mrs. Brooch's place, which place was about a mile and a quarter from the said point of intersection. It was the track of an unshod horse that followed the flight of the girl from the dead body of Scott to the point where she fell.

R. E. Pitts testified, for the State, that in March, 1885, he lived about a quarter of a mile from Kosse, on the Kosse and Franklin road, his field being immediately across the said road from his house.   He was plowing in his said field on the evening of March 13, 1885.   About four o'clock on the said evening he observed the approach over the said road from the direction of Kosse of four men riding bay or sorrel horses, and one of them leading a bay horse.   They wore cowboy hats, were otherwise dressed like cowboys, and witness took them to be cowboys.   The fact that those parties appeared to be intoxicated arrested witness's particular attention, and he stopped his plow about seventy-five yards from the said fence and observed them until they passed.   It was about ten o'clock on the next morning when the witness heard of the finding of the dead bodies of Sam Scott and Savannah Brown, near the Persimmon pond. He went to the place where the bodies were found as soon as he got the news.   The bodies had been taken up and were in a wagon when he reached the place of the tragedy.   He did not get out of his conveyance when he reached the fatal place, and saw nothing picked up from the ground, either at that place or along the road.   He noticed a tree just across the Lowery branch from Jim Wadsworth's house, which had been recently shot into, but he did not leave his conveyance to examine it. On the Sunday following the fatal Friday, the witness was in Kosse and saw the defendant and another person.   Defendant and the said other party suited the general description of two of the four parties who passed the witness's house, as stated, on the fatal Friday.   The horses they then had looked like two of the horses ridden past the witness's house by two of the four parties mentioned on the said Friday.

On his cross examination, this witness stated that "any other two men of anywhere in the neighborhood of the size of Moody and the man I saw under arrest riding bay ponies, would have suited my idea of the men who passed on Friday (as well) as Moody and the other man did."   The witness plowed in his field until late in the evening on the fatal Friday, but saw no other crowd of four men pass along the road.   The rows plowed by the witness ran to and from the road, and not parallel to it, and consequently the witness's back was toward the road about half of the time, and it was possible, perhaps, that other parties may have passed while he was plowing from the road, without being seen by him.   That, however, was not

probable, as the patch he was plowing was a small one, enclosing not more than three or four acres. The spring "round ups" were about commencing in March, 1885, when the party of four men passed the witness's place on the fatal Friday, and a great many cowboys about that time of the year passed over that road going to the cattle ranges. The point where the dead bodies of Sam Scott and Savannah Brown were found was in Limestone county, on the Kosse and Franklin road, about midway between the five and six mile posts out from Kosse.

Willie Welch testified, for the State, that, on the thirteenth day of March, 1885, he was living at his father's house, on the Kosse and Franklin road, about two miles from Kosse. He was planting corn in his father's seventy-five acre field on the evening of that day. A party of four men, riding bay or sorrel horses, and one of them leading another horse, passed witness's father's said field, on the said road, going toward Franklin about mid afternoon on the said day. As they passed along that part of the road, about opposite where the witness was at work, they were hallooing, and one of them was firing off a pistol. He fired four or five shots. The witness heard other shots fired further down the road, about or nearly opposite Wadsworth's house. On the next morning the witness heard of the finding of the dead bodies of Sam Scott and Savannah Brown, and he and his father and Church Samuels went to the point in the road opposite the corn field, where the witness saw the shots fired on the evening before, and from the ground about that point Mr. Samuels picked up four or five thirty-eight calibre, center fire pistol cartridge shells. The witness plowed near the said road during the entire evening of March 13, and saw no other crowd of men pass than the one described.

Cross examined, the witness stated that, so far as he knew, but one of the said four men had a pistol. The bodies of Sam Scott and Savannah Brown were found about five and a half miles from Kosse on the Kosse and Franklin public road. It is about half a mile from Kosse to Pitts's house; about two miles from Kosse to the point in the field where the witness was plowing on the said Friday evening; about three miles from Kosse to Wadsworth's house; about four miles from Kosse to the intersection of the Kosse and Franklin road with the road that led to Martha Brown's house, via Mrs. Brooch's house, which last mentioned house was about a mile from the said

point of intersection, and about two and a half miles from the point on the Kosse and Franklin road where the dead bodies were found. A person going from Mrs. Brooch's place to the Cole Roebuck place would travel the Brown-Brooch neighborhood road to its intersection with the Kosse and Franklin road, and then the Kosse-Franklin road toward Franklin to the point beyond the six mile post from Kosse, where the neighborhood road leading to Roebuck's place left it.

James Wadsworth testified, for the State, that he lived on the Kosse-Franklin road, about three miles southeast from Kosse. On the evening of March 13, 1885, the witness was plowing in his field about one hundred and fifty yards from the said road. About an hour and a half or two hours before sunset on that evening four men, dressed like cow boys, all riding bay or sorrel horses, and one leading an extra horse, passed along the said road going from the direction of Kosse towards Franklin. All the said parties appeared to be drunk, and the witness, expecting them to stop for water at the well at his house, unhitched his team and started to the house. The parties, however, did not stop, and witness went back to his work. A few minutes after the said parties passed, the witness heard four or five pistol shots fired down the road in the direction they went, and at about the point where, on the next morning, he observed a tree that had been recently shot into. On the next morning after seeing those men the witness heard of the discovery of the dead bodies of Sam Scott and Savannah Brown, near the Persimmon pond, and was summoned by constable Early to serve on the coroner's jury to view the bodies. Witness reached the bodies between ten and eleven o'clock on that morning—too late to serve on the inquest. The bolies lay about one hundred yards apart, midway between the five and six miles posts, out from Kosse. Scott's body lay on the side of the road. A large ball had entered his right side, passed through the body, and lodged under the skin on the opposite side. A smaller ball had entered his head at the corner of one eye. He had evidently been shot dead in his tracks, there being no indication on the ground that he took a step after receiving the first of the shots. The girl's tracks showed that she fled in a semicircle from Scott's body across the road, to the left hand side of the said road, about fifty yards from the road, and a hundred from Scott's body, where she fell, and where her body was found. One of her hands clasped a ro:l of home

cured leaf tobacco. A bullet had entered her head at the center of the forehead; which wound contained tobacco crumbs, the skin around it being powder burned. There was also a flesh wound on one of her arms. Tobacco crumbs were found along the trail passed over by the girl in her flight, and her bonnet was found in a tree top where she had evidently sought refuge from a pursurer. The track of an unshod horse followed the track of the girl throughout the distance between the two bodies. That track showed that the horse was suddenly checked at the tree top, and that at another point his feet struck the trunk of a tree behind which the fleeing girl sought shelter. The two wounds in the body of the girl and the wound in Scott's head were made by the same sized balls, while that in Scott's body was made by a larger ball. At or near the bodies one loaded cartridge and four exploded cartridge shells were found. One of the four shells was that of a forty-five calibre Colt's improved pistol cartridge, and was of the size of the bullet hole in Scott's side. The others were thirty-eight calibre Smith & Wesson pistol cartridge shells, and were of the size of the wounds on the girl's body and on Scott's head. A sack, some clothes and an old quilt were found lying near Scott's body. The clothes and quilt seemed to have been pulled out of the sack. A bench legged fice dog was squatted near Scott's body. Just after crossing Lowery's branch, en route to the dead bodies, the witness and the parties with him saw a tree into the trunk of which several bullets had been recently fired, and at the root of that tree they picked up a part of a paper thirty-eight calibre center-fire cartridge box, and the hull of a forty-five calibre center-fire cartridge, and in the load opposite the tree they found four or five empty thirty-eight calibre center-fire cartridge hulls. The cartridge box had evidently been torn open at that place and the cartridges taken out. Near this same tree an empty pale green pint whisky flask was found; all of which said articles the witness turned over to justice of the peace Hodges, and he afterwards saw them in the grand jury room at Groesbeck.

Cross examined, the witness said that he would not undertake to swear that no other crowd of four men than that referred to by him passed his house on the said Friday evening. There was a great deal of blood about the body of the dead girl, who wore pads, such as women generally wear during their menstrual flows; the said pads being in proper position.

Witness saw no indication of rape or attempted rape. The witness saw a horse track leading from Sam Scott's body up a hog trail to the girl's body, near which body it appeared to join the horse which followed the girl in her flight. From that point the two said horses went together over the trail to the road. Neither of said horses was shod. The four men who passed witness's house on the fatal evening were dressed like cow boys, wore cow boy hats, and each had a slicker tied to his saddle. There was no saddle on the led horse.

Pres Brooch testified, for the State, that he lived with his mother two and a half miles east of Kosse, in March, 1885. He was plowing in the field on the evening of the thirteenth day of said month. The witness went from the field to the house, about four o'clock on that evening, to get a drink of water. While at the house he saw Sam Scott and Savannah Brown, whom he knew well, pass the house, traveling the road known as the Brooch road, going towards the Kosse and Franklin road. Scott, followed by his bench legged dog, had on his head a bundle of clothes done up in a bed quilt, and Savannah had a roll of home cured leaf tobacco in her hand. They were walking leisurely at a gait of two and a half or three miles an hour. The witness remained at the house between ten and fifteen minutes, and when he started back to his work he called to his mother in the house to look at the clock and tell him the time. She replied that it was just four o'clock. Witness went back to his work, and had plowed about fifteen or twenty minutes when loud talking and a pistol shot fired on the Kosse-Franklin road attracted his attention. Looking in that direction he saw four men corresponding in description with those mentioned by previous witnesses. The said men were riding along the road talking loudly, laughing boisterously, and at least one of them was discharging a pistol. They appeared to be drunk. The witness could not see their horses, and only the bodies and heads of the men. Those men were traveling at a gait of four and a half or five miles an hour, and when seen by the witness they were on the Kosse-Franklin road, about a mile and a quarter from its intersection with the Brooch road, which intersection was about two miles from the point where the dead bodies of Scott and Savannah Brown were afterwards found.

Church Samuels testified, for the State, that in March, 1885, he lived on the John Welch place, on the Kosse-Franklin road,

about two miles from Kosse. He stated that he was in the field at work with Willie Welch on the evening of March 13, 1885, and he corroborated in detail the testimony of Willie Welch, adding that he took the cartridge hulls (picked up by him at the point on the road where he saw one of the parties shooting) before the grand jury and turned them over to the foreman of the same. He then testified that he reached the dead bodies on the next morning before they were removed from where found, and he corroborated in detail the narrative of the witness Wadsworth as to everything appearing on the ground, the character of the wounds on the bodies, the finding of the cartridge hulls, cartridge box and the pale green whisky flask.

On his cross examination he stated that he thought, but was not certain, that one of the four parties who passed Welch's house, on the evening of March 13, had a gray horse.

Mrs. Martha Brooch, for the State, corroborated the testimony of her son Pres., except that she stated nothing about seeing four men on the Kosse-Franklin road soon after Sam Scott and Savannah Brown passed her house.

Justice of the Peace M. P. Hodges testified, for the State, that he reached the scene of the tragedy just after the dead bodies had been placed in a wagon for removal. He did not examine the bodies critically himself, nor did he examine the ground at all. He saw the tree across Lowery's branch into the trunk of which several pistol balls had been recently fired. Somebody handed to the witness some cartridge hulls, the larger part of an empty paper cartridge box, and a pale green pint whisky flask; which articles the witness subsequently delivered to the grand jury. The cartridge hulls were of two sizes—thirty-eight and forty-five calibre—and, on a test in the grand jury room, they fitted respectively the two pistols which the witness saw in that room.

A. W. Proctor testified, for the State, that he was the foreman of the grand jury of Limestone county at the March term, 1885, which grand jury investigated the murder of Sam Scott and Savannah Brown, and presented this and other indictments. They had several witnesses before them on this case, and also certain cartridge hulls, the larger part of a paper cartridge box, and a pale green pint whisky flask; which were delivered to witness by Esquire Hodges. The cartridge hulls were of two sizes—thirty-eight and forty-five calibre. They also had two pistols before them, both of which were obtained

from Deputy Sheriff John Kimball, who reported that he took one—a forty-five calibre centre-fire improved Colt's revolver—from John P. Bagwell, and the other—a thirty-eight calibre centre-fire Smith & Wesson revolver—from Mitch Sanders. The thirty eight calibre cartridge hulls fitted the Sanders pistol, and the forty-five calibre, the Bagwell pistol. Mr. Towers was before the grand jury, and identified his private cost mark on the cartridge box.

Deputy Sheriff John Kimball testified, for the State, that he heard of the murder of Sam Scott and Savannah Brown on the morning of March 14, 1885, and started out immediately in quest of the murderers. He arrested defendant and Joe Bowers on Sunday, March 15, 1885, and Bagwell and Sanders on the following Tuesday or Wednesday. The witness arrested Bagwell at the house of Charley Moody, some eight miles east of Groesbeck, about ten o'clock in the morning, just after his return from a deer hunt. Bagwell's pistol was hanging up in Charles Moody's house, over a door. It was a forty-five calibre, center-fire improved Colt's revolver. It had been recently well cleaned and thoroughly oiled, and was not loaded. Witness arrested Sanders about nine o'clock on the night of the same day at the house of his aunt, Mrs. Bates, about fourteen miles east of Groesbeck. Sanders, when arrested, had in his possession a thirty-eight calibre, center fire Smith & Wesson six shooter pistol. The witness delivered the said pistols to the grand jury then in session at Groesbeck, and while in the grand jury room he saw same cartridge hulls inserted into the cylinder of each pistol, which they fitted perfectly. Bagwell, after his arrest, rode to Groesbeck on a large bay horse branded L4 on the shoulder. One of the feet of that horse had been cut on a wire. Sanders rode to town on a small, young black pony. From the places where witness arrested Bagwell and Sanders, to the Tom Bates place where the defendant lived, the distance was about twenty miles. The witness knew a certain forty-five calibre Colt's pistol that once belonged to Mr. Anglin, and which Major B. M. Burrows afterwards owned. The defendant and Charley Moody were not related to each other.

Charley Moody testified, for the State, that in March, 1885, he lived in Limestone county about eight miles east of Groesbeck, and about thirty miles distant from the T. J. Bates place, where defendant was said to have lived. He did not know the defendant, and was not related to him. He knew John P. Bag-

well, whose acquaintance he formed in Erath county. Deputy Sheriff John Kimball arrested Bagwell, for the murder of Sam Scott and Savannah Brown, at the witness's house in Limestone county, about March 18, 1885. Bagwell came to witness's house about eleven o'clock on the day preceding his arrest, hunting work. Witness had no work to be done and did not hire him. He brought to witness's house a forty-five calibre, center fire Colt's six-shooter, and was riding a bay horse about fifteen hands high. The horse was branded, but witness did not remember the brand, nor did he remember that the horse had a foot cut by wire. Bagwell fired his pistol off, oiled and hung it up over the door on the morning of his arrest. He was arrested immediately after he and witness got back from a deer hunt.

Harriet Scott testified, for the State, that she was the widow of Sam Scott, and the sister of Savannah Brown. She lived, on March 13, 1885, with her husband on Mr. Cole Roebuck's place. She was sick on Friday, March 13, 1885, having about a week before that date given birth to a child. On the morning of the said Friday her husband and her sister Mary, who had been attending her since her confinement, left home to go to the house of Martha Brown, witness's mother, which house was near Mrs. Brooch's place. Sam was to return home that night, bringing witness's sister Savannah with him. Witness had never seen her husband nor her sister Savannah since. She heard on the next day that their dead bodies had been found on the Kosse-Franklin road near the Persimmon pond. The witness knew the defendant. He lived in 1885, until his arrest, on the T. J. Bates place. Defendant knew Sam Scott. Some time in 1885, prior to the killing of Scott, a party of men passed Sam Scott's house. Sam Scott's fice dog ran at and barked at them, when one of the party shot at the dog. A voice, which the witness took to be the voice of the defendant, exclaimed: "Shoot him again!" Sam Scott was in his yard at that time. The witness had seen the defendant at Jim Sapp's house on that day. To go from Sapp's house to where the defendant lived a person would necessarily pass Sam Scott's house. The witness told Mr. Roebuck about the dog being shot at, and told the same thing to Mr. T. J. Bates about a month before this trial, and soon afterwards she was attached as a witness in this case. She had never before testified on the trials of this defendant nor on the trial of Sanders.

Cole Roebuck testified, for the State, that he lived in Robert-son county, about a mile and a half from the point in Lime-stone county where the dead bodies of Sam Scott and Savan-nah Brown were found. Sam Scott, at the time of his death, was a tenant of the witness and lived on his place. Mr. John Roy, who with his brother, en route to Kosse, on the morning of March 14, 1885, discovered the dead bodies, informed the witness of the discovery, and witness went to the bodies, arriv-ing there before any other persons than the Roys did. This witness's narrative and that of James Wadsworth (except that part of Wadsworth's which related to the men who passed his house on the evening of the thirteenth) is substantially the same and need not be repeated. He stated in addition that the defendant, to his knowledge, knew Sam Scott. Witness heard about Sam Scott's dog being shot at, near Sam's house, in the preceding fall, as testified by Harriet Scott.

T. J. Bates testified, for the State, that, on March 13, 1885, the defendant lived on his place, about four miles distant from the place where the dead bodies of Sam Scott and Savannah Brown were found. On the said March 13 the defendant had in his possession a certain forty-four calibre, center fire Colt's pistol, which belonged to the witness—a present to him from Major B. M. Burrows, of Groesbeck. He borrowed that pistol from witness two or three months before for the purpose, as he said, of killing hogs. The witness reached the dead bodies between nine and ten o'clock on the morning of March 14. From this point his narrative with respect to the bodies, tracks, discover-ies, etc., is substantially the same as that of the witnesses Wadsworth and Roebuck. Continuing his testimony, he stated that he went to the defendant's house on the evening of the said March 14, 1885, and got his said pistol. Joe Bowers, who was at the defendant's house, gave the pistol to witness. It was then unloaded, clean and in good order. Subsequent to the arrest of defendant and Bowers, the witness was shown two horses which were pointed out to him as the horses ridden to Kosse by the defendant and Bowers after their arrest. The witness up to that time had known defendant's horse stock, but had never known him to own those two horses, nor a strange horse that was then in his, defendant's, lot. He after-ward saw the horses on which Bagwell and Sanders were brought to town, and knew that, a short time before, those horses belonged to the defendant. According to this witness,

the track of the horse which followed the flight of Savannah Brown over the trail showed that horse to be unshod, but the track of the other horse which went from the body of Scott over the hog path to the body of Savannah Brown, showed that horse to be shod in front, but not behind.

On cross examination, this witness said that he critically examined his pistol after getting it from Bowers on the evening after the murder, but he could find no indication of it having been recently discharged. It was unloaded when witness got it back. The witness denied that on all the previous trials of this case he testified that the pistol was loaded when he got it back, and that the heads of the cartridges where they came in contract with the metal had cankered, showing that the said cartrides had been in the pistol for a long time. Although the witness knew little about the calibre of pistols, he was certain that his said pistol was a forty-four calibre. He denied that he had ever conversed with Harriet Scott about this case.

N. B. Hamilton testified, for the State, that in March, 1885, he lived about two miles from defendant's residence. The defendant spent several hours at the witness's house early in December, 1884, and during a conversation with witness asked him: "What kind of a nigger is that who lives on Cole Roebuck's place?" Witness asked him if he meant Sam Scott. He replied that he did, and witness replied: "He is a very good sort of a nigger, so far as I know. Why do you ask?" He replied: "Oh, I don't know. I hear that he calls Mrs. Roebuck 'Aunt Sue,' and the wives of John Stuart and Jim Sapp 'Sook' and 'Sal.' Before I live in this country six months I will throw him off his feet." Defendant had just prior to that time moved into that neighborhood. Witness did not know whether defendant was acquainted with Bagwell or Sanders prior to March 13, 1885.

Cross examined, the witness stated that no person but he and defendant were present at the conversation about Sam Scott, above detailed. Witness attached no importance to defendant's said threat against Scott. Defendant's wife, Mrs. Maggie Moody, who was the sister of John Stuart, died during the January preceding this trial. The witness denied that after the defendant's arrest, and while his wife and child were at home alone, he went to defendant's house, cursed and swore boisterously, and discharged a pistol in the house, and in the yard in front of the house. He admitted that he went to that

house the night of the day on which Mrs. Moody gave a cotton picking, thinking there was to be a dance, and he insisted that she should give a dance, but he did not curse and swear, and discharge his pistol on that occasion. The witness was a nephew of T. J. Bates.

Constable W. D. Early testified, for the State, that he heard of the killing of Scott and Savannah Brown, about nine o'clock on the morning of March 14, 1885, and at once summoned a jury of inquest and went to the bodies. With respect to the bodies, tracks, etc., this witness testified substantially as did the witnesses Wadsworth and Roebuck. At the conclusion of the inquest a warrant for the arrest of four unknown parties was placed in witness's hands, and he and Doctor Manuel started out in quest of said parties. At Bates's gate witness and Manuel met the defendant and Joe Bowers. Defendant said that he had heard of the discovery of the bodies of two dead negroes, down the road, and that he and Bowers were going to see them. Witness told him that the bodies had already been taken to Kosse. Doctor Manuel then said that he could go no further with witness, and advised witness to take defendant to help him in his search for the four unknown parties. Defendant consented to go, and told Bowers to go back to the house and finish up the work. Defendant did not know who witness was hunting. Witness asked him if he did not pass over the Kosse-Franklin road on the previous evening. He replied readily that he did, in company with Bowers and two other young men whose names he did not remember, except that one of them, with whom he traded for the horses he and Bowers were then riding, had a name that sounded something like Howell. He further stated that those two young men left his house on the previous evening, saying that they were going to Headville. The witness and defendant then went to the house of a deputy sheriff in Robertson county to get him to help hunt the murderers. Not finding the deputy the witness, telling defendant to go home and to be ready to accompany him on the search the next day, went to the house of a friend and spent the night. On the next morning witness got the deputy sheriff he looked for the night before, went to the defendant's house, arrested him and Bowers, and took them to Kosse and delivered them to a deputy sheriff from Groesbeck. The horse ridden by defendant to Kosse was a large bay animal, with a white spot on his belly, and the horse ridden

by Bowers was a small bay animal—being the same horses they were riding on the previous evening. When arrested, defendant asked if witne wanted his pistol. Witness replied that he did. Defendant then opened his trunk, exposing his pistol, which witness secured. It was a forty-four calibre, center fire British Bulldog pistol, and had not been recently discharged.

Cross examined, the witness said that defendant talked freely with him about traveling the Kosse-Franklin road with the other parties, on the fatal evening, and about his horse trade. He made no manner of resistance to arrest.

H. G. Sanders, the uncle of Mitch Sanders, testified, for the State, that he lived in Falls county, three miles northeast from Marlin. On his way to Marlin on Saturday, March 13 (14?), 1885, witness met his nephew, Mitch, and a man who called himself Scott, but whose name witness afterwards learned was John P. Bagwell, going to his house from towards Marlin. Their horses appeared to be jaded. Witness talked with them a few minutes and told them to go on to his house and that he would soon be back. When witness returned from Marlin he found the said parties at his house. They said they were going to a point below Kosse where they had a horse that would suit the witness for buggy work, and which they wanted to sell him. Witness declined to buy. They spent that night at witness's house, and on Sunday morning left, going towards Marlin. They acted suspiciously while at witness's house, going off to themselves with great frequency and talking privately.

John Stuart was the next witness for the State. He testified that he was the brother-in-law of the defendant—defendant's late wife being his sister. In March, 1885, the witness lived on the Bates place, near the house on the same place occupied by the defendant. On the thirteenth day of March, 1885, the witness began to plow with one of defendant's horses, a bay animal branded L4 on the shoulder, which said animal had a foot cut by wire. About an hour by sun on that evening the defendant came to the field and got the horse which witness was plowing, and told witness that he had traded that horse to some boys for some horses which witness afterwards saw in defendant's lot. That night the witness went to the defendant's house, where he found the defendant, his wife, Mrs. Ellen Button, Joe Bowers and John Sinclair. In the presence of those parties the defendant told the witness that he and Bowers and two men named Bag-

well and Sanders came together from Kosse on that evening, and that en route, near the Persimmon pond, they mobbed the negro Sam Scott and a negro girl; that they overtook the negroes walking along the road when he, defendant, rode up and shot Sam Scott down; that the girl then fled, and that he pursued, overtook and shot and killed her; that the negroes did nothing for which they were killed. He then said that he was afraid of being mobbed on that night, and asked witness and Sinclair to get their guns and sit up with him that night. Witness and Sinclair got their guns and stayed at defendant's house until about eleven o'clock. While at supper the defendant kept his pistol across his lap. Had a mob come to defendant's house that night the witness would have done nothing to help or protect the defendant.

Cross examined, the witness said that he was now testifying on the fifth trial of this case, and that he testified on the trial of Mitch Sanders involving the same transaction. On each of the previous trials the witness testified to matter which, if true, would establish an alibi for the defendant and Sanders, and that he did not hear of the killing of the negroes until Saturday evening, and on cross examination on each trial, he testified that defendant had never at any time said anything to him about killing two negroes on the evening of March 13, 1885—all of which said testimony was utterly false. After the fourth trial of defendant the witness attempted to evade testifying again on this trial, and his bond as an attached witness was forfeited. He was finally caught. Mr. Mynatt was the first man to whom the witness told the truth about his knowledge of the facts in this case, and he explained to Mr. Mynatt that he was and had been afraid to testify to the truth,—that he was afraid of the defendant, his two brothers and half brother—which statement to Mynatt was true. Mr. Mynatt told him, however, that in testifying truthfully, he would be protected by the good citizens of the country, and he decided to do so. The reason why the witness suffered the forfeiture of his bond as a witness was that he did not want to again swear to lies for the defendant, and was afraid to swear to the truth.

James Sapp testified, for the State, that to his knowledge the defendant was acquainted with Mitch Sanders prior to the fatal March 13, 1885.

County Attorney Rice testified, for the State, that he prosecuted the defendant on his four previous trials for this offense.

Mrs. Moody, defendant's wife, since deceased, testified on each of those trials that defendant, riding a brown horse named "Wide-Eye," and Bowers a gray mare, went to Kosse on March 13, 1885, and returned an hour and a half or two hours before sun set, bringing two strangers, whom she afterwards learned were named Bagwell and Sanders, with them; that the strangers and defendant and Bowers ate dinner saved over by her; that after dinner the defendant traded horses with the strangers, giving two horses and some boot for three horses; that the strangers then left, it being an hour or an hour and a half by sun, going back towards Kosse; that defendant, on getting home from Kosse, gave her Bates's pistol which he had; that she put it under the head of the bed, whence it was taken the next morning and given to Bates, and that she did not hear of the killing of the negroes until the day after it was done. She was then asked about N. B. Hamilton going to her house while defendant was confined in jail, and she answered that Hamilton came to her house one night after a cotton picking given by her, and after she had declined to give a dance, and her guests had gone, threatened to throw out her bed, cursed, and discharged his pistol inside and outside of her house, and then left.

This witness stated that on the said previous trials T. J. Bates testified that his pistol was loaded "all round" when he got it from defendant on the day after the tragedy, and that the cartridges appeared to have been in it for a long time, and that it had no appearance of having been recently discharged. John Stuart's testimony on the said previous trials was substantially as on this trial the said Stuart confessed it to have been. Z. I. Harlan, of counsel for the defendant on this and his previous trials, testified, for the State, substantially as did the witness Rice.

Joe Thomas testified, for the State, that in January, 1885, he sold to the defendant the brown horse known as "Wide-Eye," which horse the defendant subsequently used as his saddle horse. Witness saw that horse at defendant's lot about March 1, 1885, when the horse was shod in front with heavy cork shoes. Witness did not see that horse on March 13, 1885, and did not know whether or not the horse had on those shoes on that day.

The State closed.

Mrs. Ellen Button, the sister-in-law of the defendant, was his only witness. She testified that defendant and Joe Bowers went to Kosse on the fatal Friday morning, defendant riding

---

---

the brown horse known as "Wide-Eye," and Bowers a gray mare; that they returned an hour and a half or two hours before sun set, bringing with them two strangers whose names afterwards transpired to be Bagwell and Sanders; that after eating dinner defendant went to the field and got the horse with which John Stuart was plowing, returned to the house and made a horse trade with the strangers, who afterwards left, going back towards Kosse; that she, the witness, did not hear of the murder of the negroes until the next day. She denied positively and emphatically that defendant made any such confession or statement about the killing of the negroes as testified by Stuart on this trial. She stated that Stuart came to the house immediately after defendant took the plow horse from him, but that he remained but a few moments, and that neither he nor Sinclair came there that night armed with guns.

*Oltorf & Harlan*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Defendant's bills of exception to the admission of testimony over his objections are none of them well taken. Under the peculiar facts and circumstances of this case, as well as under the allegations in the indictment, the testimony was legitimate for the purpose of identifying the parties who perpetrated this most wanton and horrible murder. These bills of exception appear to have been waived or abandoned by counsel for appellant, as no mention is made of them in the able brief they have filed in this court.

The principal grounds argued and relied upon for a reversal are supposed defects and errors in the charge of the court to the jury. Appellant's fifth and sixth bills of exception present the only exceptions taken to the charge at the trial, and no requested instructions were asked in behalf of appellant. Taken as a whole, the charge, in our opinion, is not obnoxious to any of the objections urged against its correctness and sufficiency. In certain of the particulars complained of in the brief of counsel, but not excepted to, the charge would doubtless have been amplified, as it is contended ought to have been done, had special requested instructions been asked upon those points. Considering it as a whole, and in the absence of additional requested instructions, we find no substantial error, either of

omission or commission, and it appears to have fully and suffi-ciently submitted the law applicable to all the legitimate phases of the case as made by the evidence.

It is most urgently insisted that the evidence is not sufficient to sustain the verdict and judgment. We are told that this is at least the fifth time this case has been tried, and that there have been four mistrials. One of the witnesses who testified for defendant on each of the other trials, and whose testimony established for him in part his defense, which was an alibi, on this last trial recanted his former statements and testified that defendant, on the evening of the homicide, when he arrived at his, defendant's home, actually confessed to him and others that he, this defendant, with his own hands. shot and killed both of the murdered parties. This witness was, besides, a brother-in law of defendant. If his testimony is to be be-lieved, then, taken in connection with other facts in the case, there can be no question of this appellant's guilt. The judge and the jury who saw him upon the witness stand, and who heard him testify, must have given him credit for telling the truth on this, the fifth trial. It was for the jury alone to pass upon his credibility and the weight of his testimony. It is not for us to say that we might have done otherwise had we been one of their number, for of this it is impossible for us to de-termine, with nothing but the record before us. Suffice it for us to say that, with this evidence, the testimony disclosed in the record is amply sufficient to support the verdict and judg-ment, and, having found no error which authorizes us to re-verse the case, the judgment is affirmed.          *Affirmed.*